# 12-2634-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

KARINA GARCIA,

Plaintiffs-Appellees,

-v.-

JANE and JOHN DOES 1-40,

Defendants-Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR REHEARING EN BANC

ZACHARY W. CARTER
Corporation Counsel
  of the City of New York
Attorney for Defendants-
  Appellants
100 Church Street
New York, New York 10007
(212) 356-0840 or -2500

RICHARD DEARING,
RONALD E. STERNBERG,
       of Counsel.

October 6, 2014

i

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................1

BACKGROUND ........................................................................................2

PROCEDURAL HISTORY ........................................................................4

REASONS FOR GRANTING REHEARING IN BANC ..................................5

    A.  Contrary to Settled Precedent, the Majority Based the Denial
    of Qualified Immunity on the Possible Perceptions of *Plaintiffs*.........6

    B.  The Majority's Analysis Conflicts With Qualified Immunity
    Precedents in Further Ways. ..............................................................10

    C.  The Majority Wrongly Held that Its Novel Analysis Followed
    Directly From Clearly Established Law................................................12

    D.  The Majority's Ruling Will Greatly Impair the Effective
    Policing of Unpermitted Large-Scale Demonstrations. ......................12

CONCLUSION ........................................................................................16

i

# TABLE OF AUTHORITIES

<u>**Page**</u>

**Cases:**

*Amore v. Novarro,*
   624 F3d 522 (2d Cir. 2010) ............................................................. 7

*Cox v. Louisiana,*
   379 US 559 (1965) ................................................................... 12, 13

*Crawford-El v. Britton,*
   523 US 574  (1998) ...................................................................... 11

*Devenpeck v. Alford,*
   543 US 146 (2004).......................................................................... 11

*Harlow v. Fitzgerald,*
   457 US 800  (1982)........................................................................ 11

*Lennon v. Miller,*
   66 F3d 416  (2d Cir. 1995) ............................................................. 7

*Malley v. Briggs,*
   475 US 335 (1986) ........................................................................10

*Manganiello v. City of New York,*
   612 F3d 149 (2d Cir. 2010) ...........................................................10

*Papineau v. Parmley,*
   465 F3d 46 (2d Cir. 2006)..............................................................13

*Vodak v. City of Chicago,*
   639 F3d 738 (7th Cir. 2011) .....................................................13n.1

**Statutes**

New York Penal Law § 240.20............................................................. 3

## PRELIMINARY STATEMENT

The individually named defendant police officers in this action file this petition for rehearing in banc to ask this Court to reconsider a split panel decision that affirmed the denial of their motion to dismiss on the basis of qualified immunity. Rehearing in banc should be granted because the majority's ruling raises issues of exceptional importance, conflicts with the qualified immunity precedents of the Supreme Court and this Circuit, and will impair the ability of the police to manage the serious public safety concerns posed by sizable unpermitted demonstrations on the public streets.

The complaint alleges that defendants unlawfully arrested plaintiffs for disorderly conduct after they and hundreds of others affiliated with the "Occupy" movement streamed onto and blocked traffic on the vehicular roadway of the Brooklyn Bridge. It is undisputed that the marchers had no written permit, and plaintiffs do not allege that any police officer ever said they were permitted to enter the Bridge's highly trafficked roadway or waved them onto it.

As the dissenting judge on the panel observed (dissenting op., at 1), the majority's decision "threatens the ability of the police departments in this Circuit lawfully and reasonably to police large-

1

scale demonstrations and to make the necessary on-the-spot judgments about whether arrests are required in the face of unlawful conduct threatening public safety."

Rehearing in banc is warranted to restore the balance embodied in qualified immunity doctrine between maintaining accountability for public officials who act irresponsibly, while protecting officials who act reasonably (even if mistakenly) from the harassment and distraction of suit and from potential liability. Unless reconsidered by the full Court, the panel's ruling will "make[] more difficult the judicious use of discretion in policing large crowds," to the detriment of the public and of future demonstrators (dissenting op., at 27-28).

## BACKGROUND

The record here includes the complaint and several videotapes depicting the challenged events. On October 1, 2011, plaintiffs joined more than a thousand other participants in the "Occupy" movement in a march, without a required written permit, starting at Zuccotti Park in lower Manhattan, and intending to end at Brooklyn Bridge Park in Brooklyn (Joint Appendix ["A"] 162, 163, 172). Upon learning of this plan, the NYPD committed significant police resources to protect the safety of the public and the demonstrators.

2

Plaintiffs are among the 700 or so demonstrators who were arrested for disorderly conduct (New York Penal Law § 240.20) by the individual defendant police officers after hundreds of demonstrators streamed onto and reached the midpoint of the Brooklyn-bound vehicular roadway of the Brooklyn Bridge (see A152, 173-74), completely blocking traffic on that vital arterial roadway which links Manhattan and Brooklyn for about 120,000 cars and trucks daily.

Throughout the march to the Bridge, police instructed the demonstrators to remain on the sidewalk. As the demonstrators stood in the road at the foot of the Bridge, they were repeatedly warned that they would be arrested if they did not return to the sidewalk. Uncontroverted video recordings show three separate police warnings by bullhorn that specifically admonished marchers not to enter onto the Bridge's roadway (TARU Video at 24:23, 25:19, 27:26-27:46).

Plaintiffs contend that these warnings were inaudible to many present amid the noise of the demonstration. But they do not allege that any police officer ever told them or gestured to them that they had permission to stream onto the Bridge's roadway. Plaintiffs' theory seems to be that a simple physical movement of several officers—the

3

officers' turning and walking a distance up the bridge as a throng of hundreds of demonstrators amassed near them—constituted an implied grant of permission in law authorizing them to enter onto the Bridge's roadway. Yet, no individual plaintiff alleges that he or she followed the police officers onto the Bridge's roadway; rather, each alleges that he or she followed the "crowd" or the "march" or the "marchers" onto the roadway (*see* A169-172).

## PROCEDURAL HISTORY

1.     The United State District Court for the Southern District of New York (Rakoff, J.) denied the defendant officers' motion to dismiss on the ground of qualified immunity (SPA22). Upon reviewing the complaint and the video recordings submitted, the Court concluded that a "reasonable officer would have understood that it was incumbent on the police to clearly warn the demonstrators that they must not proceed onto the Brooklyn Bridge's vehicular roadway," and that the question whether such warnings were given could not be resolved at the pleadings stage (SPA18).

2.     A divided panel of this Court affirmed. The majority (Lynch and Calabresi, JJ.) held that, on "this limited record," it could not "say that on the basis of plaintiffs' account of events, no officer

4

who participated in or directed the arrests could have thought that plaintiffs were invited onto the roadway and then arrested without fair warning of the revocation of this invitation" (slip op. at 23).

Judge Livingston dissented. In her view, the majority "misapplie[d] the Supreme Court's qualified immunity cases, first subjecting police officers to the burdens of broad-reaching discovery in the absence of clearly established law supporting its strained theory of liability ... and then standing the objective reasonableness doctrine on its head" (dissenting op. at 1 [quotation marks omitted]). Judge Livingston stated that plaintiffs had failed to allege any facts "plausibly suggesting that it was anything *but* reasonable for any officer ... to conclude that each of the plaintiffs on the roadway of the Bridge" were engaged in disorderly conduct in violation of New York law (*id.* at 25 [emphasis in original]).

**REASONS FOR GRANTING REHEARING IN BANC**

Judge Livingston's dissenting opinion provides a well-reasoned road map not only for concluding that the majority turned the law governing qualified immunity "on its head" (dissenting op., at 1), but, more importantly for the purpose of this petition, for demonstrating

that the issues involved are of critical significance and warrant review by the full Court.

### A. Contrary to Settled Precedent, the Majority Based the Denial of Qualified Immunity on the Possible Perceptions of *Plaintiffs*.

The majority contravened settled precedent, first, by focusing its qualified immunity analysis on the possible perceptions of plaintiffs, rather than those of the objectively reasonable police officer. The majority ruled (at 19) that it could not "say ... whether or not defendants had sufficient knowledge of plaintiffs' perceptions of the officers' actions such that they acted unreasonably in arresting plaintiffs". But as Judge Livingston recognized (at 17), "plaintiffs' perceptions" are irrelevant in a correct qualified immunity analysis.

To be sure, a protester who did not hear police admonitions to leave the roadway or who reasonably believed that he or she had been granted permission to cross the Bridge via the roadway might be able to establish a defense in a prosecution for disorderly conduct. But, as Judge Livingston observed (at 17), "the possibility that some protesters might have a mens rea defense to the charge of disorderly conduct establishes neither that police lacked probable cause to arrest them nor that plaintiffs have plausibly alleged as much."

Nor does the majority's analysis account for the settled principle that the presence of arguable probable cause is sufficient to establish qualified immunity. "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Amore v. Novarro*, 624 F3d 522, 536 (2d Cir. 2010)(internal quotation marks omitted); *accord Lennon v. Miller*, 66 F3d 416, 423 (2d Cir. 1995).

The majority relied on two major and unsupported leaps in logic to justify relying on purported fact issues as to plaintiffs' perceptions and defendants' knowledge as to those perceptions as a basis for denying qualified immunity at this time. First, the majority assumed that if any particular demonstrator could have formed a reasonable belief that he or she had been authorized to enter onto the Bridge, this would be equivalent in law to an official grant of permission to do so. But this Court has never so held, and indeed that assumption is incorrect.

For example, if a civilian impersonating a police officer told a demonstrator that he or she was authorized to enter onto the Bridge, this might negate the intent element of disorderly conduct in a later

prosecution, but it would not constitute a legal grant of permission to enter onto the Bridge. This case presents a different situation but reflects the same principle: even if it were true that some demonstrators might reasonably have concluded that they had been authorized to enter onto the Bridge—due to their distance from the bullhorn when warnings were given, the crowd noise around them during the warnings, and their observations of demonstrators ahead of them from their particular vantage point—this would not mean that those individuals had in fact received legal permission to enter onto the roadway. Nor is the majority correct in suggesting (slip op. at 20-22) that some demonstrators may have received legal permission to enter onto the roadway, while others did not, based on the same alleged police conduct.

In addition to being legally incorrect, the majority's "implied permission" analysis is not supported by the complaint's allegations. As reviewed by Judge Livingston (at 18-21), "none of the named plaintiffs allege that they received *even an implicit* grant of permission from any officer before entering the Brooklyn Bridge roadway." To the contrary, "all of the plaintiffs ... state that they followed the crowd in front of them onto the roadway and fail to

8

allege any explicit *or* implicit signals from officers to the effect that this was permitted" (*id.* at 18).

Second, the majority's qualified immunity analysis rests on an expectation that a reasonable police officer would be able to engage in mental gymnastics of a sort that are highly unrealistic in the fluid and rapidly developing situation here. The majority assumes that any objectively reasonable officer confronted by this scene would have (a) understood and processed what each of hundreds of demonstrators might have been perceiving, and (b) been able to perfectly assess on the spot whether particular demonstrators' perceptions negated probable cause.

This analysis is not supported in prior qualified immunity cases. The supposed "Rashomon-like" nature of the scene (slip op., at 26n.14), rather than raising a fact question as to qualified immunity, establishes defendants' entitlement to it. The doctrine is designed to protect reasonable but mistaken judgments, and it does not expect omniscience from officials as a condition of its application. The majority did not take to heart its own observation (slip op., at 21) that probable cause will be negated by an affirmative defense to prosecution only where officials were aware of "conclusively

9

established evidence" proving the defense—a conclusion that cannot be reached on the record here.

### B. The Majority's Analysis Conflicts With Qualified Immunity Precedents in Further Ways.

The majority also defied precedent in concluding that qualified immunity could not be granted at this time, because it could not be determined that "no officer who participated in or directed the arrests could have thought" that plaintiffs' rights were violated (slip op., at 23). This is the "the wrong standard" (dissenting slip op., at 21), and it is directly contrary to the settled precedents of the Supreme Court and this Circuit holding that officials are entitled to qualified immunity "if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Manganiello v. City of New York*, 612 F3d 149, 165 (2d Cir, 2010); *see Malley v. Briggs*, 475 US 335, 341 (1986).

The majority also erred insofar as it assessed qualified immunity based on officers' subjective intent. As stated by Judge Livingston, the majority determined that defendants may be granted qualified immunity "only after they show 'what reasoning process they followed[,] ... why [they] chose to retreat onto the bridge, and

what if anything they intended to convey'" (dissenting op., at 26). This analysis runs counter to established Supreme Court precedent holding that "[e]vidence concerning the defendant's subjective intent is simply irrelevant to [the qualified immunity] defense." *Crawford-El v. Britton*, 523 US 574, 588 (1998); *accord Harlow v. Fitzgerald*, 457 US 800, 819 (1982).

By holding that any grant of qualified immunity must await proof of officers' subjective intent, the majority also contravened the Supreme Court's Fourth Amendment jurisprudence, which emphasizes that only objective considerations are relevant to the determination of probable cause. "Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 US 146, 153 (2004). "Evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Id.* Here, too, the majority disregarded settled precedent.

**C.    The Majority Wrongly Held that Its Novel Analysis Followed Directly From Clearly Established Law.**

The panel majority's analysis regarding implied permission to march on public streets was mistaken for the reasons described above. But even if the panel majority's analysis were correct, it would represent new law in this Circuit, not clearly established law, and thus would not be a basis to deny qualified immunity here.

The majority mistakenly suggests that its analysis follows directly from *Cox v. Louisiana*, 379 US 559, 574 (1965). In *Cox*, it was undisputed that government officials had, by their affirmative words, granted the defendant permission to demonstrate near a courthouse. The question was whether that grant of permission had been adequately revoked so as to allow the defendant to be convicted for demonstrating. 379 US at 560. This case involves neither an explicit grant of permission nor whether a demonstrator can be criminally convicted. *Cox* affords no guidance to officers in answering the main question that is posed here—namely, when police officers' non-expressive conduct will be deemed so clearly to constitute an implied

grant of permission as to preclude any reasonable officer from concluding even that there is probable cause to arrest.[1]

Nor does *Papineau v. Parmley*, 465 F3d 46 (2d Cir. 2006), come close to clearly establishing the law as framed by the majority. *Papineau* involved arrests of persons demonstrating on private property, not marchers blocking traffic on a public roadway. *See* 465 F3d at 58. A few of the demonstrators in *Papineau* had allegedly earlier distributed leaflets on a public highway, without blocking traffic. Yet the police indiscriminately arrested everyone present on the private land, without even issuing a dispersal order. *Id.* at 58-61. *Papineau* is nothing like this case, and does not speak to when police conduct will be deemed to constitute a grant of implied permission for demonstrators to enter onto and block a public roadway.

Neither plaintiffs nor the majority cited any clearly established law that would have alerted the police that they may have been granting the demonstrators implicit legal permission to mass on a

---

[1] Nor does *Vodak v. City of Chicago*, 639 F3d 738 (7th Cir. 2011), support the majority's understanding of *Cox*. In *Vodak*, municipal officials acknowledged that they had, pursuant to a longstanding practice, given the demonstrators permission to march on public streets, without issuing a formal permit. 639 F3d at 741. Citing *Cox*, the Seventh Circuit held that, once permission is given, its revocation must be communicated to individuals in advance of any arrest. *Id.* at 746-47. Here, by contrast, the key question here is whether permission was ever given to the demonstrators, and neither *Cox* nor *Vodak* provides guidance in addressing that question on these facts.

13

major arterial roadway by virtue of their tactical movement of "falling away before the insistent throng at the Bridge's base" (dissenting slip op., at 2; *see also* SPA 23n.9 [district court acknowledging that the likely explanation for the officers' "retreat," as depicted on the videos, was that "the police believed they could better control the crowd at a later point"). Qualified immunity should thus attach, because "government actors 'of reasonable competence could disagree on the legality of the action at issue in its particular factual context'" (dissenting op., at 21).

Moreover, as noted above, it is undisputed that all of the named plaintiffs here followed the crowd, not the police, onto the Bridge (see, Pls' Br., at 19). "Markedly absent from this putative class action complaint is any allegation that a single named plaintiff even *saw* the police officers at the base of the Brooklyn Bridge prior to walking onto the roadway" (dissenting op., at 19). As Judge Livingston correctly observed (at 19-20), "surely it cannot be argued to have [been] clearly established that police may not arrest someone who receives no grant of permission from police at all (actual or apparent), but merely follows another citizen's lead in engaging in unlawful conduct."

**D. The Majority's Ruling Will Greatly Impair the Effective Policing of Unpermitted Large-Scale Demonstrations.**

The dissenting judge was also correct to observe (dissenting op., at 1) that the majority's ruling will greatly complicate effective policing of large-scale unpermitted demonstrations.

The majority holds it against defendants that they safely policed the progress of the demonstration along sidewalks from Zuccotti Park to the entrance to the Brooklyn Bridge. The majority also signals to police officers that their conduct in these fluid and high-pressure situations will henceforth be second-guessed in sober hindsight, on the assumption that any objectively reasonable officer can and will constantly monitor and process the individual perceptions of hundreds or thousands of demonstrators. And the majority effectively warns officers that, going forward, any tactical retreat, forbearance, or avoidance of confrontation at the earliest moment in policing an unpermitted demonstration may work against them in a later civil suit, exposing them to litigation, discovery, and potential liability.

For these reasons, the majority's ruling, if not reconsidered by the full Court, will make it harder to police demonstrations, will threaten the public safety, and will worsen not improve the lot of

15

future demonstrators. Before this case, the reasonable police conduct depicted on the video recordings here would have been protected in this Circuit from both suit and liability—and it still should be so protected under the doctrine of qualified immunity.

## CONCLUSION

The petition for a rehearing in banc should be granted.

Dated:     New York, New York
           October 6, 2014

                              Respectfully submitted,

                              ZACHARY W. CARTER
                                *Corporation Counsel of the*
                                *City of New York*
                              **Attorney for Appellants**

RICHARD DEARING
RONALD E. STERNBERG
       *of Counsel*

16

12-2634-cv
Garcia v. Jane & John Does

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

August Term, 2012

(Argued: April 22, 2013     Decided: August 21, 2014)

Docket No. 12-2634-cv

---

KARINA GARCIA, AS CLASS REPRESENTATIVE ON BEHALF OF HERSELF AND OTHERS
SIMILARLY SITUATED, YARI OSORIO, AS CLASS REPRESENTATIVE ON BEHALF OF
HERSELF AND OTHERS SIMILARLY SITUATED, BENJAMIN BECKER, AS CLASS
REPRESENTATIVE ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED,
CASSANDRA REGAN, AS CLASS REPRESENTATIVE ON BEHALF OF HERSELF AND OTHERS
SIMILARLY SITUATED, YAREIDIS PEREZ, AS CLASS REPRESENTATIVE ON BEHALF OF
HERSELF AND OTHERS SIMILARLY SITUATED, TYLER SOVA, AS CLASS REPRESENTATIVE
ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED, STEPHANIE JEAN UMOH, AS
CLASS REPRESENTATIVE ON BEHALF OF HERSELF AND OTHERS SIMILARLY SITUATED,
MICHAEL CRICKMORE, AS CLASS REPRESENTATIVE ON BEHALF OF HIMSELF AND
OTHERS SIMILARLY SITUATED, BROOKE FEINSTEIN, AS CLASS REPRESENTATIVE ON
BEHALF OF HERSELF AND OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

MARCEL CARTIER, AS CLASS REPRESENTATIVE ON BEHALF OF HIMSELF AND OTHERS
SIMILARLY SITUATED,

*Plaintiff,*

— v. —

JANE AND JOHN DOES 1-40, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES,

*Defendants-Appellants,*

RAYMOND W. KELLY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, CITY OF NEW YORK, MICHAEL R. BLOOMBERG, IN HIS OFFICIAL CAPACITY AND INDIVIDUALLY,

*Defendants.*[*]

_____

B e f o r e :

CALABRESI, LIVINGSTON, and LYNCH, *Circuit Judges.*

_____

Defendants-appellants, New York Police Department officers, appeal from an order of the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) denying their motion pursuant to Rule 12(b)(6) to dismiss plaintiffs-appellees' complaint against them on qualified immunity grounds. Defendants argue that the district court erred in concluding that plaintiffs' complaint, and the other materials that could properly be considered on a motion to dismiss for failure to state a claim, did not establish that defendants had

_____

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

2

arguable probable cause to arrest plaintiffs for disorderly conduct. We disagree, and affirm the judgment of the district court.

AFFIRMED.

Judge Livingston dissents in a separate opinion.

———————————

MARA VERHEYDEN-HILLIARD (Andrea Hope Costello and Carl Messineo, *on the brief*), Partnership for Civil Justice Fund, Washington, D.C., *for Plaintiffs-Appellees*.

RONALD E. STERNBERG, Assistant Corporation Counsel (Leonard Koerner and Arthur G. Larkin, Assistant Corporation Counsel, *on the brief*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, *for Defendants-Appellants*.

———————————

GERARD E. LYNCH, *Circuit Judge*:

Defendants-appellants ask us to definitively conclude, on the limited record before us on their motion to dismiss for failure to state a claim, that they are entitled to qualified immunity for their arrest of a group of demonstrators. Because we cannot resolve at this early stage the ultimately factual issue of whether certain defendants implicitly invited the demonstrators to walk onto the roadway of the Brooklyn Bridge, which would otherwise have been prohibited

3

by New York law, we AFFIRM the judgment of the United States District Court

for the Southern District of New York (Jed S. Rakoff, *Judge*).

## BACKGROUND

Plaintiffs commenced this action for false arrest under 42 U.S.C. § 1983

following their arrests for participating in a demonstration in support of the

Occupy Wall Street movement. Although plaintiffs have not been able to

conduct discovery, they attached five video excerpts and nine still photographs

as exhibits to the Second Amended Complaint (the "Complaint"), which we

consider when deciding this appeal, see DiFolco v. MSNBC Cable L.L.C., 622 F.3d

104, 111 (2d Cir. 2010). We also consider videos submitted by defendants, which

plaintiffs concede are incorporated into the Complaint by reference. For

purposes of this appeal, we take as true the facts set forth in the Complaint, see

Almonte v. City of Long Beach, 478 F.3d 100, 104 (2d Cir. 2007), to the extent that

they are not contradicted by the video evidence.

I.    The Protest and Plaintiffs' Arrests

On October 1, 2011, thousands of demonstrators marched through Lower

Manhattan to show support for the Occupy Wall Street movement. The march

began at Zuccotti Park in Manhattan and was to end in a rally at Brooklyn Bridge

Park in Brooklyn. Although no permit for the march had been sought, the New

York City Police Department ("NYPD") was aware of the planned march in

advance, and NYPD officers escorted marchers from Zuccotti Park to the

4

Manhattan entrance to the Brooklyn Bridge (the "Bridge"), at times flanking the marchers with officers on motorscooters or motorcycles. Those officers issued orders and directives to individual marchers, at times directing them "to proceed in ways ordinarily prohibited under traffic regulations absent police directive or permission." J. App'x at 165. The officers blocked vehicular traffic at some intersections and on occasion directed marchers to cross streets against traffic signals.

When the march arrived at the Manhattan entrance to the Bridge, the first marchers began funneling onto the Bridge's pedestrian walkway. Police, including command officials, and other city officials stood in the roadway entrance to the Bridge immediately south of the pedestrian walkway and, at least at first, watched as the protesters poured across Centre Street towards the Bridge. A bottleneck soon developed, creating a large crowd at the entrance to the Bridge's pedestrian walkway. While video footage suggests that the crowd waiting to enter the pedestrian walkway blocked traffic on Centre Street, defendants do not contend that they had probable cause to arrest plaintiffs for their obstruction of traffic at that point, as opposed to their obstruction of traffic on the Bridge roadway. Indeed, plaintiffs alleged in their complaint that the police themselves stopped vehicular traffic on Centre Street near the entrance to the bridge[1] before the majority of the marchers arrived at the entrance to the Bridge.

---

[1] There are three eastbound entry ramps to the Bridge on the Manhattan side. The ramp referred to here is the first ramp moving from west to east.

5

While a steady stream of protesters continued onto the walkway, a group of protesters stopped and stood facing the police at the vehicular entrance to the Bridge at a distance of approximately twenty feet. Some of these protesters began chanting "Take the bridge!" and "Whose streets? Our streets!" An officer stepped forward with a bullhorn and made an announcement. In the video taken by NYPD's Technical Assistance Response Unit, the officer can clearly be heard repeating several times into the bullhorn: "I am asking you to step back on the sidewalk, you are obstructing traffic."

Plaintiffs, ten protesters who purport to represent the class of all protesters arrested that day, allege that the officers knew that these statement were "generally inaudible." J. App'x at 166. In a video provided by plaintiffs, recorded from roughly the second row of protesters, it is clear that protesters even at the front of the crowd twenty feet away could not make out the words of this announcement over the noise of the demonstration. Two minutes later the same officer announced into the bullhorn: "You are obstructing vehicular traffic. If you refuse to move, you are subject to arrest," and "If you refuse to leave, you will be placed under arrest and charged with disorderly conduct." While it is clear that at least one marcher at the front of the crowd heard this announcement, plaintiffs allege that the officers knew that they had not given any warnings or orders to disperse that would have been audible to the vast majority of those assembled.

6

A minute and a half after the second announcement, the officers and city officials in the lead group turned around and began walking unhurriedly onto the Bridge roadway with their backs to the protesters. The protesters began cheering and followed the officers onto the roadway in an orderly fashion about twenty feet behind the last officer. The protesters on the roadway then encouraged those on the pedestrian walkway to "come over," and the videos show several protesters jumping down from the pedestrian walkway onto the roadway. When one such protester was told by someone still on the pedestrian walkway "Don't go into the street, you will get arrested," he can be heard responding, "Whatever, they're allowing us to." Officers initially blocked protesters from impeding the second and third entry ramps to the Bridge and the southernmost lane of traffic, but eventually both of these ramps and all lanes of traffic across the Bridge were blocked by the protesters.

Midway across the bridge, the officers in front of the line of marchers turned and stopped all forward movement of the demonstration. An officer announced through a bullhorn that those on the roadway would be arrested for disorderly conduct. Plaintiffs allege that this announcement was as inaudible as the previous announcements. Officers blocked movement in both directions along the Bridge and "prevented dispersal through the use of orange netting and police vehicles." J. App'x at 173. The officers then methodically arrested over seven hundred people who were on the Bridge roadway. These individuals were "handcuffed, taken into custody, processed and released throughout the night into the early morning hours." Id. at 174.

7

Plaintiffs allege that the officers "led the march across the bridge," and that the marchers saw the officers' movement onto the roadway as an "actual and apparent grant of permission to follow." J. App'x at 168. They allege that the combination of those officers in front "leading" the protesters onto the roadway and the officers on the side escorting them along the roadway led them to believe that the NYPD was escorting and permitting the march to proceed onto the roadway, as it had escorted and permitted the march through Lower Manhattan earlier in the day. Officers at the roadway entrance did not instruct the ongoing flow of marchers not to proceed onto the roadway. Other officers walked calmly alongside the protesters in the roadway and did not direct any protesters to leave the roadway. The named plaintiffs allege that they did not hear any warnings or orders not to proceed on the roadway, and understood their passage onto the Bridge roadway to have been permitted by defendants.[2] Several allege that they did not even realize they were on the roadway until they were already on it. Plaintiffs allege that "[p]rior to terminating the march when it was mid-way across the bridge, the police did not convey that they were going to revoke the actual and apparent permission of the march to proceed," and that the officers therefore did not have probable cause to arrest them for disorderly conduct. Id. at 173.

---

[2] While one plaintiff, Cassandra Regan, acknowledges that she was told to leave the roadway, she alleges that the warning was given only after defendants had blocked off the roadway and no exit was possible.

II.    District Court Proceedings

Plaintiffs sued the unidentified NYPD officers who participated in their arrests[3] as well as Mayor Michael Bloomberg, Police Commissioner Ray Kelly, and the City of New York, alleging that the arrests violated plaintiffs' rights under the First, Fourth, and Fourteenth Amendments.  Defendants moved to dismiss plaintiffs' Second Amended Complaint on qualified immunity grounds and pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978), arguing, in part, that the Complaint and the videos demonstrate that they had probable cause to arrest plaintiffs for disorderly conduct.[4]

The district court denied the motion to dismiss the claims against the individual officers and granted the motion to dismiss the claims against the City,

---

[3] Eleven of these 40 John and Jane Does have since been identified and their names have replaced "John/Jane Does ## 1-11" in the caption of the district court proceedings.  When the Complaint was filed and the relevant district court opinion was issued, however, none of the NYPD officers who participated in the arrests had been identified.

[4] While defendants initially arrested many of the plaintiffs for failure to obey a lawful order, the offense that an officer cites at the time of the arrest need not be the same as, or even "closely related" to, the offense that the officer later cites as probable cause for the arrest.  See Devenpeck v. Alford, 543 U.S. 146, 154-55.  Defendants now argue that plaintiffs engaged in disorderly conduct, defined as "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . obstruct[ing] vehicular or pedestrian traffic."  N.Y. Penal Law § 240.20.  While defendants argued before the district court that they also had probable cause to arrest plaintiffs for marching without a permit in violation of New York City Administrative Code § 10-110(a), defendants have abandoned that argument on appeal.

9

Bloomberg, and Kelly.[5]  Garcia v. Bloomberg, 865 F. Supp. 2d 478 (S.D.N.Y. 2012).
The district court held that the allegations of the Complaint, if true, established
that a reasonable officer would have known that he did not have probable cause
to arrest plaintiffs.  The district court further held that while plaintiffs had clearly
violated the law by entering the Bridge roadway and blocking vehicular traffic,
based on the facts alleged, no reasonable police officer could believe that
plaintiffs had received fair warning that their behavior was illegal, as required by
law.  The district court concluded that while New York's disorderly conduct
statute would normally have given protesters fair warning not to march on the
roadway, it did not do so here, where defendants, who had been directing the
march along its entire course, seemed implicitly to sanction the protesters'
movement onto the roadway.[6]

 Defendants now appeal the denial of their motion to dismiss on qualified
immunity grounds, arguing that under the circumstances, "an objectively

_____

 [5] Plaintiffs argued that the City of New York maintains a policy, practice,
and/or custom of trapping and arresting peaceful protesters without probable
cause.  The district court held that plaintiffs had not plausibly alleged any such
policy, practice, or custom.  That interlocutory ruling is not before us, and we
have no occasion to address its merits.

 [6] The district court stressed that its conclusion did "not depend in any way
on a finding that the police actually intended to lead demonstrators onto the
bridge."  Garcia, 865 F. Supp. 2d at 491 n.9.  Indeed, the court considered it far
more likely that defendants had decided to move the protesters to a point where
they believed they could better control them, not that defendants had
orchestrated a "charade" to create a pretense for arrest.  Id.

10

reasonable police officer would not have understood that the presence of police officers on the Bridge constituted implicit permission to the demonstrators to be on the Bridge roadway in contravention of the law."[7] Appellants' Br. at 3.

## DISCUSSION

I.    Appellate Jurisdiction

We have jurisdiction over an appeal from a district court's denial of qualified immunity at the motion to dismiss stage because "qualified immunity – which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights – is both a defense to liability and a limited entitlement not to stand trial or face the other burdens of litigation." Ashcroft v. Iqbal, 556 U.S. 662, 672 (2009) (citation and internal quotation marks omitted). "Provided it turns on an issue of law," a denial of qualified immunity is a final reviewable order because it "conclusively determine[s] that the defendant must bear the burdens of discovery; is conceptually distinct from the merits of the plaintiff's claim; and would prove effectively unreviewable on appeal from a final judgment." Id. ((internal quotation marks omitted); see also Locurto v. Safir, 264 F.3d 154, 164 (2d Cir. 2001) (noting that "denials of immunity are conclusive with regard to a defendant's right to avoid *pre-trial* discovery, so long as the validity of the denial

---

[7] Defendants also moved to dismiss plaintiffs' claims for failure to state a claim and for failure to properly notify the City of the claims. Defendants do not appeal the denial of these motions.

of the qualified immunity defense can be decided as a matter of law in light of the record on appeal" (emphasis in original)).

II.     Standard of Review

We review a district court's denial of qualified immunity on a motion to dismiss de novo, "accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001).

III.    Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Russo v. City of Bridgeport, 479 F.3d 196, 211 (2d Cir. 2007) (internal quotation marks omitted). Defendants bear the burden of establishing qualified immunity. Vincent v. Yelich, 718 F.3d 157, 166 (2d Cir. 2013). "Even if this or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other courts clearly foreshadow a particular ruling on the issue, even if those decisions come from courts in other circuits." Scott v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010) (citation and internal quotation marks omitted).

An officer is entitled to qualified immunity against a suit for false arrest if he can establish that he had "arguable probable cause" to arrest the plaintiff. Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir. 2013) (internal quotation marks omitted). "'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Id., quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "In deciding whether an officer's conduct was objectively reasonable . . . , we look to the information possessed by the officer at the time of the arrest, but we do not consider the subjective intent, motives, or beliefs of the officer." Amore v. Novarro, 624 F.3d 522, 536 (2d Cir. 2010) (internal quotation marks omitted).

Under both federal and New York law, an officer "has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Dickerson v. Napolitano, 604 F.3d 732, 751 (2d. Cir. 2010) (internal quotation marks omitted); see also Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (holding that a police officer has probable cause to arrest when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense"). Where an arrest is made without warrant, "the

13

defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." <u>Dickerson</u>, 604 F.3d at 751.

IV.    <u>Probable Cause and the First Amendment</u>

The First Amendment's prohibition on laws "abridging the freedom of speech . . . or the right of the people peaceably to assemble," U.S. Const. amend. I, "embodies and encourages our national commitment to 'robust political debate,'" <u>Papineau v. Parmley</u>, 465 F.3d 46, 56 (2d Cir. 2006), quoting <u>Hustler Magazine v. Falwell</u>, 485 U.S. 46, 51 (1988). It protects "political demonstrations and protests – activities at the heart of what the Bill of Rights was designed to safeguard." <u>Id</u>. Courts have therefore been especially solicitous where regulation of protests threatens to discourage the exercise of First Amendment rights.

<u>Cox v. State of Louisiana</u> established that when officials grant permission to demonstrate in a certain way, then seek to revoke that permission and arrest demonstrators, they must first give "fair warning." 379 U.S. 559, 574 (1965). In <u>Cox</u>, officials explicitly permitted civil rights protesters to demonstrate across the street from a courthouse, even though a statute prohibited demonstrating "near" a courthouse. <u>Id</u>. at 568-69. A few hours later, the officials changed their minds and ordered the demonstrators to disperse, arresting those who refused. <u>Id</u>. at 572. The Supreme Court held that because the statute prohibiting demonstration "near" the courthouse was vague, the demonstrators had justifiably relied on the officials' "administrative interpretation" of "near," <u>id</u>. at 568-69, and that the

14

protesters' conviction for picketing where directed by officials therefore violated due process.

We reiterated the need for fair warning in <u>Papineau</u>. 465 F.3d at 60-61. There, the plaintiffs were protesting on private property bordering a public highway. A handful of protesters violated state law by briefly entering the highway to distribute pamphlets. Later, once the protesters were all back on private property, police officers marched onto the property and began arresting protesters without giving any warning. <u>Id</u>. at 53. We affirmed the district court's denial of qualified immunity to the officers, holding that even if the officers had a lawful basis to interfere with the demonstration, the plaintiffs "still enjoyed First Amendment protection, and absent imminent harm, the troopers could not simply disperse them without giving fair warning." <u>Id</u>. at 60, citing <u>City of Chicago v. Morales</u>, 527 U.S. 41, 58 (1999) ("[T]he purpose of the fair notice requirement [in disorderly conduct statutes] is to enable the ordinary citizen to conform his or her conduct to the law." (alteration in original)). <u>Papineau</u> also suggested in dictum that if the police had granted permission to demonstrate in a certain fashion, as in <u>Cox</u>, "even an order to disperse would not divest demonstrators of their right to protest." <u>Id</u>. at 60 n.6.

The Seventh and Tenth Circuits have applied <u>Cox</u>'s requirement of fair warning before revoking permission to protest to situations similar to the protest here. In <u>Vodak v. City of Chicago</u>, protesters were arrested after walking down a street that officers arguably led them to think was a permitted route along their

15

march. 639 F.3d 738, 743-44 (7th Cir. 2011). While officers had ordered protesters not to march westward from their planned route, on one street they stood aside and permitted protesters to march westward, then moved in behind the protesters and arrested them. Some marchers alleged that they believed that the police were directing them to proceed west on the road. Id. at 744. The court denied qualified immunity to the officers, finding that while the officers did not give explicit permission to move west down the street, "their presence, not blocking the avenue, might have made the marchers think it a permitted route west for them." Id. In Buck v. City of Albuquerque, a protester was arrested for marching without a permit and walking in the street. 549 F.3d 1269, 1283 (10th Cir. 2008). The Tenth Circuit denied qualified immunity to the arresting officers, holding that taking facts in the light most favorable to the plaintiff, the police officers' "street closures and direction of the procession sanctioned the protesters walking along the road and waived the permit requirement." Id. at 1284.

V.    Probable Cause to Arrest Plaintiffs

Defendants acknowledge that "[i]n some circumstances, advice from officials as to the propriety of proposed conduct may indeed justify an individual in believing that his planned conduct is not prohibited," Piscottano v. Murphy, 511 F.3d 247, 286 (2d Cir. 2007), and that had the officers explicitly invited protesters onto the bridge, they could not have arrested the protesters without fair warning of the revocation of such permission. Indeed, defendants concede that the involvement of officers in directing the protest prior to its movement

16

onto the roadway "may have sanctioned the demonstration . . . so long as the parameters of the implied permission were complied with and the demonstrators remained on the sidewalk." Appellants' Br. at 28-29.

However, defendants argue that the protesters violated this initial implied permission when they left the sidewalk and entered the Bridge roadway. They argue that after this point in the march, plaintiffs' actions were in direct contravention of the officers' repeated admonitions to protesters to remain on the sidewalk, and that plaintiffs have not alleged facts sufficient to establish that a reasonable police officer would have understood that plaintiffs had been invited onto the roadway. Defendants argue that a reasonable officer would have understood that the lead group of officers were not "leading" the protesters onto the roadway but were instead strategically retreating, "reacting to a surging crowd that was following leaders who were intent on 'taking the bridge' despite both the law and direct and explicit warnings that their continued presence on the roadway would result in arrest." Appellants' Br. at 28. In such a situation, where no "implicit invitation" had been given to proceed onto the roadway, defendants argue that New York's disorderly conduct statute, which criminalizes "obstruct[ing] vehicular or pedestrian traffic" with "intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," N.Y. Penal Law § 240.20, gave plaintiffs fair warning that their conduct was illegal, and no further warning was necessary.

17

Defendants have identified the relevant inquiry: not whether plaintiffs will ultimately prevail, or whether a reasonable demonstrator would have understood the police's actions as an invitation to enter the roadway, but rather whether a reasonable police officer (in the position of the officers who decided to arrest plaintiffs) should have known that under the totality of the circumstances, the conduct of the police could have been reasonably understood by plaintiffs as an implicit invitation to enter the Bridge roadway, and thus should have known that additional, louder, or clearer instructions were required. But defendants' assertions of what the officers understood are unsupported by the Complaint or the record, which do not provide any details as to what any individual defendant knew or saw of the events leading up to the arrests.[8] Further, to the extent that defendants' arguments rest on a markedly different characterization of the events of the protest than those alleged by plaintiffs, we are unable to consider the

---

[8] The dissent references the Supreme Court's recent decision in Wood v. Moss, 134 S. Ct. 2056 (2014), implying that the decision requires us to ignore the reality of what each defendant officer knew or saw. But Wood did not unmoor the reasonableness standard from facts as they transpire in an individual case. In Wood, the Court reasoned that a discriminatory motive cannot be inferred from facts that conclusively point in a neutral direction, in that case, towards officers' reasonable concern for the safety of the President. Id. at 2069. But that common-sense conclusion does not change the analysis here. Officers at the Brooklyn Bridge had a constitutional obligation to warn protesters of a revoked invitation to march on the roadway. If the officers knew, or should have known, that their actions would be construed by reasonable protesters as inviting them onto the bridge, then a reasonable officer should have issued a fair warning revoking that permission. Plaintiffs allege that the officers' actions amount to such an invitation. Discovery will illuminate whether that it is indeed true.

18

resulting factual dispute at this stage. We must take the Complaint's allegations as true when considering defendants' motion to dismiss, as they are not "blatantly contradicted" or "utterly discredited" by the submitted videos and still images, Scott v. Harris, 550 U.S. 372, 380 (2007).[9]

Given the paucity of the record as to the actions of any specific defendant on the day of the march, we cannot say at this stage whether or not defendants had sufficient knowledge of plaintiffs' perceptions of the officers' actions such that they acted unreasonably in arresting plaintiffs. A homely analogy will illustrate what is ultimately a common-sense point. Any driver knows that he may not ordinarily cross an intersection against a red light, but that an officer directing traffic can lawfully order him to ignore the red light and proceed. We assume arguendo that being signaled by a police officer to proceed in the face of a red light would be a valid defense for a driver charged with running that red light. In that situation, an officer who directed a driver to proceed, or realized that her gesture could reasonably have been seen as giving such a directive, would clearly act unreasonably by ticketing the driver for ignoring the red light. On the other hand, a second officer who saw the driver run the red light but was unaware of her colleague's instructions to do so would have probable cause to ticket the driver.

---

[9] The videos and still images submitted by the parties are inconclusive on these points. They depict only what can be seen and heard from particular vantage points, and not what the police or protesters in general, or particular officers named as defendants, saw and heard.

The facts of this case are of course far more complicated than this simple example. Although we have recounted the facts by referring to "the police" and "the demonstrators," we have done so only because the record is so undeveloped that we cannot specify the conduct or knowledge of particular named defendants. Ultimately, to recover damages, the plaintiffs will need to establish that particular defendants acted unreasonably in arresting them (or directing their arrest). Just as some demonstrators (but not others) might be convicted of disorderly conduct because it can be proven that they had heard and defied a clear warning that they were obstructing traffic and needed to move, so discovery might reveal that some police officers (but not others) were fully aware of facts that would lead reasonable officers to know that many of the demonstrators reasonably understood that they had been granted permission to proceed across the bridge, just as plaintiffs allege.

Given this standard, plaintiffs may have a difficult time establishing liability or avoiding the qualified immunity defense at a later stage of litigation.[10] In order to have a reasonable belief that probable cause exists, an officer need not anticipate or investigate every possible defense that a person suspected of violating the law may have, and an officer may have probable cause despite knowledge of facts that create an arguable defense. On the other hand, as <u>Cox</u>

---

[10] The difficulty may be especially pronounced with respect to officers who were unaware of earlier events, and were directed by superiors to arrest demonstrators who plainly appeared, at that later stage of events, to be in violation of New York Penal Law § 240.20(5).

and Papineau clearly establish, an officer may not constitutionally arrest a demonstrator when he is personally aware that responsible officials have implicitly or explicitly authorized the very conduct for which he seeks to make the arrest. As the Seventh Circuit has held, "[o]nce a police officer discovers sufficient facts to establish probable cause, she has no constitutional obligation to conduct any further investigation in the hope of discovering exculpatory evidence," but "[a] police officer may not ignore conclusively established evidence of the existence of an affirmative defense." Hodgkins ex rel. Hodgkins v. Peterson, 355 F.3d 1048, 1061 (7th Cir. 2004); see also Fridley v. Horrighs, 291 F.3d 867, 873 (6th Cir. 2002) (holding that an officer, when assessing probable cause, "is not required to inquire into facts and circumstances in an effort to discover if the suspect has an affirmative defense," but may not "ignore information known to him which proves that the suspect is protected by an affirmative legal justification" (emphasis and internal quotation marks omitted)).

Taking plaintiffs' allegations as true, as we must, we believe that they have adequately alleged actionable conduct. Plaintiffs have alleged that the police directed the demonstrators' activity along the route of their march, at times specifically condoning, or even directing, behavior that on its face would violate traffic laws. When the bottleneck at the pedestrian walkway of the Bridge led the demonstrators to pool into the roadway, the police did not immediately direct them out of the street, and when they did undertake to issue such a warning to clear the roadway, they did so in a way that no reasonable officer who observed

21

the warning could have believed was audible beyond the first rank of the protesters at the front of the crowd.[11]  According to plaintiffs' account, the police then retreated back onto the Bridge in a way that would reasonably have been understood, and was understood, by the bulk of the demonstrators to be a continuation of the earlier practice of allowing the march to proceed in violation of normal traffic rules.

We emphasize that the procedural posture of this case presents a formidable challenge to defendants' position.  They urge us to find that qualified immunity is established for all defendants based on *plaintiffs'* version of events (plus a few inconclusive photos and videos).  The evidence, once a full record is developed, may contradict plaintiffs' allegations, or establish that some or all of the defendants were not aware of the facts that plaintiffs allege would have alerted them to the supposed implicit permission.  We express no view on

---

[11] The fact that some protesters clearly heard the warning does not establish probable cause to arrest the entire group, when defendants knew that the vast majority had *not* heard the warning.  See Papineau, 465 F.3d at 59-60 (holding that officers could not engage in "indiscriminate mass arrests" of a group where a few unidentified individuals from the group had violated the law).  Nor would any warning the officers gave after demonstrators had already proceeded halfway across the bridge qualify as "fair warning."  At that point, the police had allegedly blocked off any avenues of retreat.  As the district court noted, "[i]mplicit in the notion of 'fair warning' is an opportunity for plaintiffs to conform their conduct to requirements."  Garcia, 865 F. Supp. 2d at 488 n.7; see also Morales, 527 U.S. at 58 (noting that "the purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law").

whether some or all of the defendants may be entitled to qualified immunity at a later stage of the case. Cf. Pena v. DePrisco, 432 F.3d 98, 111-12 (2d Cir. 2005) (affirming denial of application for qualified immunity at motion to dismiss stage without prejudice to renew application at a later stage). But to reverse the district court's denial of qualified immunity on a motion to dismiss, we would have to say that on the basis of plaintiffs' account of events, no officer who participated in or directed the arrests could have thought that plaintiffs were invited onto the roadway and then arrested without fair warning of the revocation of this invitation.[12] Since we cannot do so on this limited record, we affirm the judgment of the district court.[13]

------

[12] Contrary to the dissent's assertion, to say that officers may have had different experiences is not to say that they were all reasonable or all unreasonable. Discovery is necessary in this case simply because, as a factual matter, individual officers may have had different experiences on the day of the march, and, thus, some may be liable and some may not, depending on what they saw, heard, and knew. With a full record, the district court can then evaluate whether reasonable officers could disagree about the legality of what each officer did.

[13] We also affirm the district court's denial of qualified immunity on plaintiffs' state law claims, as our analysis of federal qualified immunity is equally applicable to qualified immunity under New York law, which "in the context of a claim of false arrest depends on whether it was objectively reasonable for the police to believe that they had probable cause to arrest." Papineau, 465 F.3d at 64.

VI.  <u>The Dissent</u>

We add a few words in response to Judge Livingston's dissent, which seems to us to ignore the procedural context of this decision, and accordingly to draw unwarranted conclusions about the nature and consequences of our holding today.  We emphatically do *not* hold that – and have no occasion to decide whether – any police officer acted unlawfully, is liable for damages, or lacks qualified immunity for his or her actions on the day in question.  As we have clearly stated, upon the development of an appropriate factual record, any or all of the police officer defendants may well properly be found entitled to qualified immunity at the summary judgment stage, or after trial.  The dissent, however, engages in a lengthy description of various inflammatory facts gleaned from a viewing of some of the videotapes submitted by the parties, all taken from differing and partial perspectives, and treats its factual conclusions as established facts about what "the police" were aware of.  If it turns out, after discovery, that no reasonable factfinder could see the evidentiary record differently than the dissent does, qualified immunity may well prove appropriate.

Even at the summary judgment stage, however, it is well established that dismissal on qualified immunity grounds may not be granted when factual disputes exist, unless the defendants concede the facts alleged by the plaintiffs for purposes of the motion.  <u>Loria v. Gorman</u>, 306 F.3d 1271, 1280 (2d Cir. 2002), citing <u>Coons v. Casabella</u>, 284 F.3d 437, 440 (2d Cir. 2002).  Here, we are at an even earlier stage, at which defendants, in order to prevail, must be entitled to

24

qualified immunity *based on the very facts alleged by the plaintiffs*. While we agree that a motion to dismiss on such grounds can lie, success on such a motion must be limited to situations where immunity is clear based on the allegations in the complaint itself. As is evident from the dissent, defendants here do not rest their claim to immunity on the allegations of the complaint, but rather on an extensive analysis of "facts" asserted by the defendants. The existence of videotapes depicting *some* of the events from the perspectives of *some* of the participants does not establish those facts; a comparison of the tapes recording the police announcement to the protesters to disperse makes entirely apparent how different the events could appear from different vantage points.

To take only a few examples: the dissent suggest that some protesters lawfully headed onto the pedestrian walkway of the Bridge while others unlawfully headed for the roadway. But that is hardly established fact. The pedestrian walkway is narrow, and large numbers of demonstrators appear to have pooled on Centre Street, near the entrance to both the roadway and the walkway, as they approached the bottleneck at the Bridge entrances. Defendants do not argue that they had probable cause to arrest these demonstrators, who were already in the roadway of Centre Street. Indeed, the complaint implies that the police themselves had blocked off traffic at that point. And, according to the complaint, the police alleviated congestion at the base of the bridge by inviting protesters to ignore traffic laws and stream across Centre Street regardless of walkway signals and standard right-of-way rules. Given police tactics that day,

25

officers could quite plausibly have decided to channel the ballooning mass of protesters onto the Bridge roadway in order to keep the march moving towards its end on the other side of the East River, and, thus, protesters may have reasonably believed that officers were doing so whether that was their true motive or not.[14] It is hardly apparent that many of the protesters who eventually entered the Bridge roadway did so knowing that they were eschewing a concededly lawful alternative and taking an illegal turn onto that road.

Similar questions of fact undermine the dissent's conclusion that the officers on the scene all made objectively reasonable decisions. Contrary to the dissent's suggestion, it is not clear that "it was anything *but* reasonable for any officer – named or John Doe – to conclude that each of the plaintiffs on the roadway of the Bridge (among the thousands who did not take to the roadway and were not arrested) was obstructing traffic." (Dis. Op. at 25). At the time the district court decided the motion in question, essentially all of the defendants

---

[14] The dissent states that neither the complaint, photos, or videos support this narrative. But this conclusion reflects the Rashomon-like quality of this case. Photos attached as Exhibits, B, C, and D to the Second Amended Complaint depict throngs of people pooling on Centre Street, the entrance to the bridge's pedestrian path, and the plaza to the east of City Hall. In each, members of the crowd stand shoulder to shoulder. And at 23:12, the video focuses on a crowd of people waiting at a standstill on Centre Street, looking around as if unsure where to go and what to do. Perhaps the dissent believes that the befuddled crowd had no reason to think that it should migrate onto the roadway. That may be true. But at this stage in the litigation it is but one view of facts that can be arranged and understood in multiple ways, including along the lines asserted by plaintiffs in their complaint.

were sued as John Does. While some officers participating in the arrest have now

been identified, there is no clear record yet of who made the decision to arrest the

protesters on the roadway, where the decisionmakers were stationed, what those

decisionmakers observed, and what reasoning process they followed. We do not

know why the officers at the front of the march chose to retreat onto the bridge,

and what if anything they intended to convey.[15] As noted above, we share the

dissent's expectation that many individual officers participating in the arrests,

based on their perspective on the events, will have had every reason to believe

that the protesters were acting unlawfully, and will have reasonably participated

in the arrests. It does not follow, however, that those who made the command

decisions for the police to retreat onto the Bridge (and thus to create a situation in

which the protesters moved forward and eventually blocked traffic from other

eastbound entrance ramps that may have been unimpeded before the police

moved back), and then to arrest the protesters who predictably followed them,

would have been similarly unaware that the protesters' actions had previously

been condoned and that no adequate warning had been given. Based on the

---

[15] This is not to say that officers' subjective experience will ultimately
decide the qualified immunity question. But the officers' perspective will surely
help illuminate what actually happened in those pivotal moments on the bridge.
Put differently, were an officer to admit that he led marchers onto the bridge with
the intent of inviting them to continue marching on the roadway, such testimony
would certainly corroborate protesters' contention that the officers' retreat onto
the bridge objectively appeared to be an invitation to continue marching on the
roadway.

allegations of the Complaint, and the confused images from the videos submitted, the experienced district judge correctly ruled that discovery should go forward.

Nor do we regard the applicable law as unsettled. The dissent correctly notes that <u>Cox</u> does not address the issue of probable cause. As the dissent concedes, however, <u>Cox</u> holds that when demonstrators have been given police permission to be where they are, they cannot be found guilty of a crime absent clear warning that permission has been revoked. If a person cannot as a matter of law be guilty of a crime, an officer aware of the facts establishing the applicable defense cannot have probable cause to make an arrest. In any event, our own holding in <u>Papineau</u> applies exactly this analysis in the qualified immunity context. It may well be that no police officer, including those who made the critical tactical decisions in this case, was aware of the relevant facts. It is impossible, however, to know that at this stage.

Unlike the dissent, we do not regard this case as presenting novel issues of weighty consequence. The only question before us is whether the Complaint on its face (or as supplemented by a handful of still and moving images) unequivocally establishes that the officers unquestionably had either probable cause or arguable probable cause to arrest the plaintiffs. Our answer is that it does not.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

28

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

The majority misapplies the Supreme Court's qualified immunity cases, first subjecting police officers to "the burdens of broad-reaching discovery" in the absence of clearly established law supporting its strained theory of liability, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."); *accord Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (noting that the "'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials . . . be resolved prior to discovery" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)), and then standing the objective reasonableness doctrine on its head. In so doing, it threatens the ability of police departments in this Circuit lawfully and reasonably to police large-scale demonstrations and to make the necessary on-the-spot judgments about whether arrests are required in the face of unlawful conduct threatening public safety. Respectfully, I dissent.

The New York City Police Department ("NYPD") officers who policed the movement of thousands of "Occupy Wall Street" protesters from Zuccotti Park to the Brooklyn Bridge on October 1, 2011, brought these many people (who did not obtain a permit before their march) through downtown Manhattan safely and, so far as the Second Amended Complaint (the "complaint" or "putative class action complaint") alleges, without incident. Amidst loud and insistent chants of "Take the Bridge! Take the Bridge!," demonstrators at the head of the march thereafter defied police instructions to use the Bridge's footpath and instead led a subset of protesters

1

onto the Bridge's roadway – a vehicular artery that constitutes both a major route for daily traffic moving between lower Manhattan and downtown Brooklyn and, during emergencies, for the movement of first responders. As a result, some 700 demonstrators who took to the roadway (among the thousands who did not) were arrested.

The putative class action complaint is devoid of allegations that even *one* of these many protesters suffered any indignity at the hands of police – any indignity, that is, apart from the fact of arrest while obstructing all traffic on the Brooklyn Bridge. The majority determines, nevertheless, that some 40 officers making arrests that day are not entitled to qualified immunity, at least at the motion to dismiss stage. But the majority can point to no clearly established law supporting its theory of potential police liability: which is, in essence, that because police escorted these unpermitted demonstrators to the Bridge, sometimes assisting them in crossing the street against the light, police thereby incurred a "constitutional obligation to warn protesters of a revoked invitation to march on the roadway," apparently by using sound amplifying equipment adequate to the majority's taste. Maj. Op. 18 n.8. Citing *Cox v. Louisiana*, 379 U.S. 559 (1965), the majority claims that because: (1) some of the 700 may not have heard the repeated police instructions to stay off the Bridge roadway; and (2) police may have "implicitly" (if inadvertently) "invited the demonstrators to walk onto the roadway of the Brooklyn Bridge," Maj. Op. 3, by assisting them in crossing streets and then falling away before the insistent throng at the Bridge's base, discovery must be had as to whether the 40 police officers "had sufficient knowledge of plaintiffs' perceptions of the officers' actions" – so that

police "acted unreasonably," Maj. Op. 19, in believing they had probable cause to arrest. But *Cox* does not suggest – much less clearly establish – any such thing.

And that is for the best. Police are called upon to shepherd demonstrators through busy city streets and, to do so safely, they sometimes overlook infractions (such as the absence of a permit) either to expedite the movement of large and sometimes raucous crowds, to minimize disruption to others, or simply to avoid unnecessary confrontation with people out to have their say. The majority's "rule of *Cox*" suggests that in so doing, police will henceforth repeatedly incur the costs of class action inquiry into the question whether their conduct implicitly invited later illegality by demonstrators and whether officers had "knowledge of plaintiffs' perceptions of the officers' actions" so as to defeat probable cause for subsequent arrests. To avoid the costs of civil litigation in such a fantastical world, police managers would be wise to counsel officers to arrest at the first infraction (irrespective of any risk this might pose), to disregard nothing, and thereby to suppress much First Amendment expression. Thus, in a case like this, arrests should have begun, perilously, when the obdurate protesters in front first stepped onto the Bridge roadway – or perhaps when marchers first stepped foot on a city street.[1]

---

[1] The New York Civil Liberties Union, in an amicus brief, urges the panel not to reach the question whether New York City Administrative Code § 10-110(a) (providing in relevant part that "[a] procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefor has been obtained from the police commissioner") applies to marches conducted wholly on the sidewalks. Although both parties appear to have agreed below that § 10-110(a) applies to sidewalk marches (so that the unpermitted Occupy demonstrators were subject to arrest from the start), the issue need not be decided here, since the Occupy marchers who were arrested were on the roadway of the Brooklyn Bridge – a location, incidentally, for which a permit is clearly required.

3

This is not the law of qualified immunity. As the Supreme Court said only last Term, "[r]equiring [an] alleged violation of law to be 'clearly established' 'balances . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Pearson*, 555 U.S. at 231) (ellipsis in *Wood*). The "dispositive inquiry," the Supreme Court said, "is whether it would have been clear to a reasonable officer" in the position of those on the Bridge "that their conduct was unlawful in the situation they confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)) (brackets and internal quotation marks omitted).

The majority turns this standard upside down, asserting that qualified immunity at the motion to dismiss stage is appropriate only if, taking as true the plaintiffs' allegations, "no officer who participated in or directed the arrests could have thought" that police were violating the plaintiffs' constitutional rights. Maj. Op. 23. Alluding to the supposed "Rashomon-like quality" of this case, Maj. Op. 26 n.14, the majority concludes that extensive inquiry into the police officers' "knowledge of plaintiffs' perceptions of the officers' actions," Maj. Op at 19, is required before it can be determined if the defendants are entitled to have this case dismissed. But the majority is wrong. The plaintiffs have not alleged facts plausibly suggesting that a reasonable police officer would have believed she was violating the Constitution by arresting those "Occupy Wall Street" demonstrators who posed a threat to public safety by occupying the roadway of the Brooklyn Bridge. Not even close. In such circumstances, the officers are presently entitled to qualified immunity. It's a shame they are being denied its protections.

4

I.

At the start, the majority contends, erroneously, that my conclusion that this complaint should be dismissed "do[es] not rest . . . on the allegations of the complaint, but rather on an . . . analysis of 'facts'" from the photographic and video exhibits. Maj. Op. 25. But the majority acknowledges – as it must – that the plaintiffs' photographs and videos are attached to their complaint and that the defendants' videos have been "incorporated into the Complaint" by reference. Maj. Op. 4. These photographs and videos are thus *part* of the complaint, *see Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (brackets and internal quotation marks omitted)); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."), and Supreme Court precedent *requires* that we consider them, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts *must* consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference. . . ." (emphasis added)). Moreover, contrary to the majority's claim, the analysis here as to why these officers are presently entitled to qualified immunity is in no way dependent on my adoption of "various inflammatory facts gleaned" from videotapes offering "differing and partial perspectives" on the events of the day. Maj. Op. 24. Rather, it proceeds from the complaint's allegations, as supplemented by basic, indisputable facts depicted in the photographs and videos. Those facts are presented here.

5

* * *

On October 1, 2011, after camping in lower Manhattan for almost two weeks, supporters of the "Occupy Wall Street" movement staged an unpermitted march through lower Manhattan. The protesters planned to march from Zuccotti Park to the Brooklyn Bridge Park. Aware of these plans, the NYPD deployed substantial resources, including dozens of patrol officers, as well as officers on bicycles, motorscooters, motorcycles, in police cruisers, and in other types of vehicles, to accompany the mass of people, which numbered in the thousands, as they marched. Police officers escorting the marchers north from Zuccotti Park provided them with a steady stream of oral and visual directions, ordering them repeatedly, as depicted in the video footage, to stay on the sidewalks and to keep within pedestrian walkways. The police also on occasion restricted the movement of traffic and pedestrians along the unpermitted route, facilitating the protesters' movement across streets while at the same time ensuring not only the safety of protesters, but also that of the New York City residents and visitors among whom the march was staged. At other times, and again as shown in the video footage, police officers formed human "walls" between protesters and the street to keep the protesters out of vehicular traffic and to keep vehicles away from the protesters.

The protest proceeded from Zuccotti Park to the entrance of the Brooklyn Bridge without incident, so far as the complaint alleges, and despite the thousands involved. The video footage of the trek from Zuccotti Park to the Bridge further establishes, beyond peradventure, that the police permitted the demonstrators to march only *on the sidewalk*, and not in the street, except at crossings. "Nobody is walking in the street; everyone is walking on the sidewalk," said one officer with a

6

bullhorn. "Folks, I need everyone to walk on the sidewalk." The putative class action complaint at no point alleges that protesters were permitted to march on the streets, except when crossing, on the way to the Brooklyn Bridge. As the very first protesters reached the entrance to the Bridge, moreover, these protesters marched directly onto the Bridge's pedestrian walkway, apparently at the direction of officers and in compliance with the general instructions throughout to stay out of traffic.[2]

But not so other protesters, who wanted to march over the vehicular roadway. Several of them, two holding a red flag that said, "PEOPLE NOT PROFITS," headed onto the roadway rather than the pedestrian promenade. They motioned for others to follow. The crowd on the roadway grew and within a few moments, a group of two dozen or more protesters had positioned themselves on the roadway and begun to chant. A large group quickly amassed there; the resulting congestion restricted

---

[2] The majority posits that my assertion that "some protesters lawfully headed onto the pedestrian walkway of the Bridge . . . is hardly established fact." Maj. Op. 25. But this fact is both pled in plaintiffs' complaint and shown clearly in the plaintiffs' photographs attached thereto. *See* Second Amended Complaint ¶ 87 ("[T]hose in the front of the march crossed Centre Street and moved to the pedestrian walkway or promenade of the Brooklyn Bridge."); *id.* ¶ 88 ("When the front section of the march encountered the narrow pedestrian walkway of the bridge, there was a natural congestion as the large group began to file onto the smaller walkway."); *id.* ¶ 100 ("hundreds of persons upon the pedestrian walkway"); *id.* ¶ 104 n.2 ("The original front of the march had entered onto the pedestrian walkway with several hundred others."). Indeed, the plaintiffs' class action complaint cites two of its own pictorial exhibits and asserts that these pictures show this very thing. *Id.* ¶ 88 (alleging that exhibit B depicts a "large number of marchers entering and on the pedestrian walkway); *id.* (alleging that exhibit C depicts the "pedestrian walkway packed with marchers while [the] roadway remains clear"). Thus, at this stage, it is indeed a fact that we take as given in assessing the complaint. The majority's criticism of my dissent for asserting that "some protesters lawfully headed onto the pedestrian walkway" is bewildering.

7

vehicular traffic, which began to form behind the protesters, as well as pedestrian traffic both onto the Bridge and at its base.

The majority asserts that because the Bridge's pedestrian walkway is narrow and demonstrators depicted in the videos appear to have pooled on Centre Street, at the Bridge's base, officers initially "could quite plausibly have decided to channel the ballooning mass of protesters onto the Bridge roadway in order to keep the march moving towards its end on the other side of the East River." Maj. Op. 25. To be clear, the complaint does not allege any such thing (which is irrelevant to the qualified immunity analysis herein in any event), nor does the video or photographic evidence depict it. The incorporated video material *does* clearly show, however, that NYPD Captain Jack Jaskaran, after briefly conferring with fellow officers, approached the by now sizable crowd on the roadway with a bullhorn and stated, "Ladies and gentlemen, you are blocking the roadway. You need to go to the sidewalk." Plaintiffs contend that this command was not audible to many in the roadway. But there is no dispute that Jaskaran said (consistent with police instructions throughout the march to remain on the sidewalk): "You are obstructing traffic. You need to get on the sidewalk."

Despite this repeated warning, the crowd remained on the roadway, faced by a small number of officers who were standing farther up the roadway to the Bridge. The crowd now chanted "Whose streets? Our streets!" This chant was loud enough to be audible to the entire crowd at the base of the Bridge. Once begun, the chant continued for another minute during which other protesters, disregarding the assembled (and loudly chanting) group on the roadway, proceeded up the pedestrian promenade.

8

Captain Jaskaran then gave a third warning, asking the wayward protesters to leave the roadway. Around this time a shirtless protester with a large red star on his back, who was standing at the front of the crowd, turned his back on the officers to face the assembled throng. He stood silently with his fist raised. The crowd standing on the roadway had grown considerably by this point. The protesters continued to chant: "Whose streets? Our streets!" A spontaneous cheer erupted.

Shortly afterward, the demonstrators ceased chanting "Whose streets? Our streets!" and began loudly and vigorously screaming, "Take the Bridge!" The shirtless man had by now turned to face the police, fist still raised. Captain Jaskaran again announced that the protesters were obstructing vehicular traffic, and he stated that if they refused to move, they would be placed under arrest: "You are obstructing vehicular traffic. You are standing in a roadway. If you refuse to move, you are subject to arrest." Jaskaran identified himself, using the bullhorn, as an NYPD captain. He ordered all protesters to leave the roadway and stated that if the protesters refused to leave they would be arrested and charged with disorderly conduct. Demonstrators, including those standing directly in front of Captain Jaskaran, continued to chant, "Take the Bridge! Take the Bridge!" The man without a shirt, fist still raised, asked Captain Jaskaran to confirm the charge the protesters would face. When informed that those refusing to leave would be charged with disorderly conduct, he replied, "Just disorderly?"

Further signaling their intention to march on the Bridge's roadway, whether permitted by police or not, the protesters at the front of the crowd, facing police, linked arms. The shirtless man stood in front of them, fist still raised. The front line of the protesters moved forward several feet to align itself with the shirtless man.

Nine protesters, arms linked, continued slowly walking forward, the crowd following behind. A spontaneous cheer then erupted from the crowd. Police can thereafter be seen in the video footage walking in front of the demonstrators along the side of the roadway. The plaintiffs allege that the officers "led" them up the roadway. But not a single named plaintiff alleges that he or she *saw* any NYPD officer leave his position blocking the Bridge's roadway and invite demonstrators onto it. Instead, the named plaintiffs allege simply that they followed other protesters onto the Bridge.

Car traffic, meanwhile, continued to enter the Bridge's roadway from a ramp ahead of the protesters. Officers can be seen in the video footage redeploying to stop the vehicular traffic – and thus to protect the safety of the demonstrators – before demonstrators reached the ramp. The protesters in front continued to link arms as the mass of people moved further onto the Bridge, filling up the roadway. As demonstrators approached a second ramp from which cars were still entering the Bridge, police walked beside and in front of the demonstrators, at one point forming a human line between the cars entering the roadway and the protesters moving up it. Protesters continued to chant as car horns sounded. Eventually, all vehicular traffic ground to a halt.

The demonstrators marched up the roadway, still chanting "Whose streets? Our streets!," until the police formed a line partway across the Bridge, halting the march. When those in the front of the march had stopped a few feet in front of the police, Captain Jaskaran announced: "Ladies and gentlemen, since you have refused to leave this roadway, I have ordered you arrested for disorderly conduct." The crowd responded by chanting, "Let us go!" The officers began arresting the

10

protesters. There was some jostling as the police made arrests. Some protesters climbed up to the promenade in an apparent effort to avoid being arrested. There are no allegations of any injuries or use of excessive force during these arrests, however, which numbered over 700.

Nine of the arrested protesters, on behalf of a putative class of all those arrested that day, brought a 42 U.S.C. § 1983 claim against the City of New York, former Mayor Michael Bloomberg, former Police Commissioner Ray Kelly, and the NYPD officers involved in their arrests. The protesters seek both compensatory and punitive damages from the arresting officers, along with attorneys' fees, alleging violations of plaintiffs' First, Fourth, and Fourteenth Amendment rights and bringing state law claims for false arrest, negligence, gross negligence, and negligent supervision. The district court granted a motion to dismiss as to the City, Mayor Bloomberg, and Commissioner Kelly, rejecting plaintiffs' claim to have plausibly alleged a pattern of "indiscriminate mass false arrest" and noting that out of the thousands of protesters marching that day, only the 700 who proceeded onto the Brooklyn Bridge's vehicular roadway were arrested. *Garcia v. Bloomberg*, 865 F. Supp. 2d 478, 492-93 (S.D.N.Y. 2012). The district court denied the motion to dismiss the claims against the individual police officers, however, determining that plaintiffs *had* plausibly alleged that by "turn[ing] and . . . walking away from the demonstrators and onto the roadway" at the base of the Bridge, police had thereby issued protesters "an implicit invitation to follow" that deprived officers of the protection of qualified immunity in carrying out arrests, at least at this stage. *Id.* at 489. The officers timely appealed.

11

## II.

Qualified immunity is an affirmative defense designed to "protect[ ] the [defendant public] official not just from liability but also from suit . . . , thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial." *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65 (2d Cir. 1999). The majority characterizes my conclusion that these officers are presently entitled to qualified immunity as an "unwarranted conclusion[ ]" that ignores the procedural posture of this case. Maj. Op. 24. But the Supreme Court has, by its own description, "repeatedly stressed the importance of resolving immunity questions at the *earliest possible stage* of the litigation." *Wood*, 134 S. Ct. at 2065 n.4 (emphasis added) (brackets and internal quotation marks omitted); *see also Saucier*, 533 U.S. at 200 (stating that a ruling on qualified immunity "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive"), *overruled on other grounds by Pearson*, 555 U.S. 223 (2009). Indeed, only last Term the Supreme Court reversed the denial of a motion to dismiss on qualified immunity grounds, for the very reason present here: that protesters in the context of a demonstration had failed to "allege[ ] violation of a clearly established . . . right" based on the "on-the-spot action" of law enforcement agents engaged in crowd control. *See Wood*, 134 S. Ct. at 2061, 2066.[3]

---

[3] The Secret Service agents sued in *Wood* for alleged First Amendment violations were charged with protecting the President and, in that capacity, required protesters to move "some two blocks away" from a restaurant at which the President had made a "last-minute decision to stop." *Id.* at 2060-61. The Supreme Court reversed the Ninth Circuit's decision affirming the district court's denial of a motion to dismiss on the ground that the plaintiff protesters had failed to allege the violation of any clearly established law. *Id.* at 2061.

Qualified immunity shields officers from suits for money damages provided that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *See Harlow*, 457 U.S. at 806-07. It provides a broad shield, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Liability is precluded, moreover, if government actors "of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010) (internal quotation marks omitted). Thus, an officer is protected by qualified immunity unless (1) his conduct violated "clearly established constitutional rights," *Holcomb v. Lykens*, 337 F.3d 217, 220 (2d Cir. 2003) (quoting *Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996)), and (2) it would have been unreasonable for him to have believed otherwise, *see Manganiello*, 612 F.3d at 165. As set forth below, this test, fairly applied, dooms plaintiffs' allegations as a matter of law.

## A. The Complaint Alleges No Violation of Clearly Established Law

The standard for "clearly established law" is a familiar one: the right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (brackets and internal quotation marks omitted). In other words, "existing precedent must have placed the . . . constitutional question . . . *beyond debate*." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (emphasis added) (internal quotation marks omitted). In this Circuit, we look to whether (1) the right was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that

13

his conduct was unlawful. *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). Further, a determination of whether the right at issue is "clearly established" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citation omitted).

The majority does not afford the NYPD officers who policed the "Occupy Wall Street" demonstration this basic protection. The majority contends that a single Supreme Court decision – *Cox v. Louisiana*, 379 U.S. 559 (1965) – established the rule that (as the majority puts it) "when officials grant permission to demonstrate in a certain way, then seek to revoke that permission and arrest demonstrators, they must first give 'fair warning.'" Maj. Op. 14. This is an interesting lesson to draw from *Cox*, which discusses neither arrest nor fair warning by police. *See Cox*, 379 U.S. at 572. Indeed, *Cox* does not even address the Fourth Amendment, nor the question of probable cause – the legal issue of consequence to whether these police officers are entitled to qualified immunity – but the different issue of whether a citizen may be *punished* for a crime, consistent with due process, for undertaking conduct "which the State had clearly told him was available to him." *Cox*, 379 U.S. at 571 (quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959)) (internal quotation marks omitted). At any rate, it is not necessary to squabble over the majority's "rule of *Cox*" to determine whether plaintiffs have adequately alleged its violation. *See Pearson*, 555 U.S. at 227 (holding that in conducting qualified immunity analysis,

14

courts need not determine whether an official's conduct violated constitutional rights before addressing whether such rights are clearly established). Even accepting the majority's view of the matter, *Cox* sets forth no *clearly established right* which these officers are plausibly alleged to have transgressed.

The facts of *Cox* make this abundantly clear. The appellant in *Cox* was convicted pursuant to a statute that prohibited picketing or parading "near a building housing a court" with the intent, *inter alia*, of influencing judges, jurors, witnesses, or court officers in the discharge of their duties. 379 U.S. at 560. There was no question in the case that the appellant had staged a protest in the vicinity of a courthouse, with the requisite intent. The problem in *Cox*, as laid out in the Supreme Court's opinion, was that "the highest police officials" of Baton Rouge, "in the presence of the Sheriff and Mayor," had given the appellant *express permission* to stage his protest where he did, on the west side of the street, directly across from the court. *Id.* at 571. The Supreme Court concluded that in these circumstances, Cox's conviction violated due process because protesters "were affirmatively told that they could hold the demonstration on the sidewalk of the far side of the street, 101 feet from the courthouse steps" – in effect, "that a demonstration at the place it was held would not be one 'near' the courthouse within the terms of the statute." *Id.* This affirmative authorization was thus integral to the Supreme Court's holding that it would be "an indefensible sort of entrapment by the State" to punish a citizen for engaging in an activity that "the State had *clearly told* him was available to him." *Id.* (emphasis added) (internal quotation marks omitted). For *Cox* states expressly that if the appellant had staged his demonstration in the very same spot *without* this express authorization, "or *a fortiori,* had he defied an order of the police requiring

15

him to hold this demonstration at some point further away," the matter "would be subject to quite different considerations." *Id*. at 571-72.

*Cox*, then, is a very different case from the one alleged in this class action complaint. For plaintiffs here do not and cannot allege that the police provided them any express, clear, and undisputed grant of permission to be on the Brooklyn Bridge roadway. The majority, moreover, concedes this point – arguing *not* that such affirmative permission is adequately alleged, but that some demonstrators (basically, those not in front, and allegedly unable to hear Captain Jaskaran's instructions) might simply have *inferred* they had permission from the fact that vastly outnumbered police officers did not block their entrance onto the roadway and may have earlier assisted them in crossing streets against the light. In effect, the majority takes a due process right (a right not to be entrapped by government officials who expressly assure that conduct will not constitute a violation and then seek to punish for it) and converts it into a Fourth Amendment right not to be *arrested* in circumstances in which no such assurance has been afforded, and on the theory that the police here had a constitutional obligation to provide over 700 demonstrators with "additional, louder, or clearer instructions," Maj. Op. 18, before reacting to the fact that these demonstrators, warned throughout the march to stay on the sidewalk, elected instead to "take" the Brooklyn Bridge roadway.

This newly discovered Fourth Amendment right is neither the due process right recognized in *Cox* nor a clearly established rule derived from *Cox*. *Cox* does not involve (or even mention) the Fourth Amendment. Nor can the majority's rule be derived from Fourth Amendment first principles. The Fourth Amendment only requires that officers have "a reasonable ground for [the] belief" that an arrestee has

16

committed a crime. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). No implied permission through inaction can be used to negate this reasonable belief. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (officers have "discretion in deciding when and where to enforce city ordinances" (internal quotation marks omitted)). There is similarly no clearly established authority for the proposition that *First* Amendment interests, however important, trump the operation of ordinary Fourth Amendment law, *cf. Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), much less traffic regulations. Simply put, the basis for the majority's constitutional rule is a constitutional puzzle, and I cannot see how this is clearly established law of which a reasonable officer would be aware.

To be clear, a protester who didn't hear police admonitions to leave the roadway and who believed police had granted him permission to cross the Bridge amidst traffic might well establish a defense to the charge of violating New York's disorderly conduct statute, which criminalizes obstructing traffic with "intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." N.Y. Penal Law § 240.20(5). But the possibility that some protesters might have a *mens rea* defense to the charge of disorderly conduct establishes neither that police lacked probable cause to arrest them nor that plaintiffs have plausibly alleged as much. For *Cox* sets forth no clearly established constitutional right to the "additional, louder, or clearer instructions" that the majority apparently believes should have issued at the base of the Brooklyn Bridge. The majority's claim to the contrary notwithstanding, its "rule of *Cox*" is simply not clearly established law.

Moreover, even if there were any doubt whether *Cox* covers the general situation described above – and there is not – there is no doubt that *Cox* does not

17

cover the claims outlined by the nine named plaintiffs in this case. Although wholly ignored by the majority, none of the named plaintiffs allege that they received *even an implicit* grant of permission from any officer before entering the Brooklyn Bridge roadway. Instead, all of the plaintiffs (many of whom specifically allege that they marched on the sidewalk to get to the Bridge or heard officers "frequently issue[ ] directives to stay on the sidewalk") state that they followed the crowd in front of them onto the roadway and fail to allege any explicit *or* implicit signals from officers to the effect that this was permitted:

- Plaintiff Becker "did not see or hear any police at [the] time" when he "reached the bridge." He "followed the people in front of him forward, entering the roadway of the bridge because he happened to be on the right side of the crowd." J.A. 169.

- Cartier "followed the march. He did not hear any warnings, orders, directives or indications from police that following the march was not permitted." J.A. 169-70.

- Crickmore was "[f]ollowing and within the body of the march" when he "entered upon the roadway of the Brooklyn Bridge. He was given and heard no orders or warnings not to be upon the roadway." J.A. 170.

- Feinstein "only" saw officers "[w]hen crossing the street from City Hall Park to the Brooklyn Bridge." She "continued to follow the crowd and entered the roadway as she followed the people ahead of her." J.A. 170.

- Garcia "followed the march." J.A. 171.

- Osorio "followed the march forward. He did not see or hear any police at this time. [He] did not realize he was on the roadway of the bridge until [later]." He only "subsequently saw police officers walking on the side of the crowd in the roadway." J.A. 171.

18

- Perez "marched in the same direction that she observed the escorting police officers to be walking." J.A.171.

- Sova followed "several hundred persons entering the roadway," and "did not hear any orders or directives not to proceed or follow the march on the roadway." It was only after he was "on the bridge roadway" that "he observed officers alongside the march." J.A. 172.

- Umoh "followed the marchers proceeding on the right, which happened to be on the roadway. . . . As she entered the roadway[,] . . . [she] did not see any police officers." J.A. 172.

Markedly absent from this putative class action complaint is any allegation that a single named plaintiff even *saw* the police officers at the base of the Brooklyn Bridge prior to walking onto the roadway – a prerequisite, one would think, to these officers having "invited [plaintiffs] onto the roadway and then arrested [them] without fair warning of the revocation of this invitation." Maj. Op. 23. The plaintiffs allege only that they saw the police officers *after* they had entered the vehicular roadway of the Bridge.

The fact that each of the named plaintiffs did nothing more than follow the crowd onto the roadway (amidst insistent chants, it should be noted, of "Take the Bridge!") destroys their claim that police violated any clearly established rule emanating from *Cox* by arresting them. For even if the majority were correct (and it is not) as to the clearly established rule it finds in *Cox* – namely, that a loud and clear warning is constitutionally required before a demonstrator's arrest whenever police may be argued to have implicitly, if inadvertently, signaled permission to commit an offense – surely it cannot be argued to have clearly established that police may not arrest someone who receives no grant of permission from police at all

19

(actual or apparent), but merely follows another citizen's lead in engaging in unlawful conduct.

Nor does the majority gain any refuge of clearly established law from our decision in *Papineau v. Parmley*, 465 F.3d 46 (2d Cir. 2006). The majority simply misreads it. *Papineau*, contrary to the majority's claim, did not "reiterate" any fair warning requirement from *Cox* and did not even cite *Cox* except in a footnote, and for a proposition not relevant here. The plaintiffs in *Papineau* challenged neither a conviction nor an arrest, but asserted claims of excessive force and interference with First Amendment rights in connection with a demonstration that took place on private property. *See* 465 F.3d at 57-58. Because the protest occurred on private property, the plaintiffs in *Papineau* did not need (or receive) any sort of permission from the police to conduct their protest. Thus, *Papineau* is simply not germane to the "rule in *Cox*" that the majority finds to be clearly established.[4]

---

[4] The majority also relies on two out-of-circuit cases, noting that a right may be "clearly established if decisions by this or other courts clearly foreshadow a particular ruling on the issue, even if those decisions come from courts in other circuits." Maj. Op. 12 (quoting *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)). To the extent these cases are apposite, they extend *Cox* beyond its due process holding and agree on neither the constitutional right at stake nor its contours. These cases cannot foreshadow the law of which a reasonable officer in this circuit should be aware, *cf. Weber v. Dell*, 804 F.2d 796, 801 n.6, 803-04 (2d Cir. 1986) (finding a right clearly established when this circuit's previous cases foreshadowed the rule and seven other circuits found the right established), rendering applicable the general rule that "[w]hen neither the Supreme Court nor this Court has recognized a right, the law of our sister circuits and the holdings of district courts cannot act to render that right clearly established," *Pabon v. Wright*, 459 F.3d 241, 255 (2d Cir. 2006).

### B. The Complaint Alleges No Objectively Unreasonable Conduct

Even if the majority were right as to the scope of clearly established law, moreover, qualified immunity still shields these officers from money damages in this class action suit. For even when constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights," qualified immunity is still appropriate "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991); *see also Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990). Qualified immunity therefore allows for "reasonable mistakes" in an officer's application of law to fact. *Saucier*, 533 U.S. at 205.

Contrary to well-settled precedent, the majority dispenses with this protection for the police officers at the Brooklyn Bridge. The majority asserts that qualified immunity would be appropriate at the motion to dismiss stage in this case only if, based on the plaintiffs' account of events, "no officer who participated in or directed the arrests could have thought [that the plaintiffs' rights were violated]." Maj. Op. 23. This is the wrong standard. Under Supreme Court and Second Circuit precedent, officials are granted qualified immunity if government actors "of reasonable competence could disagree on the legality of the action at issue in its particular factual context," *Manganiello*, 612 F.3d at 165 (internal quotation marks omitted). "In an unlawful arrest action," moreover, "an officer is . . . *subject to suit* only if his 'judgment was so flawed that no reasonable officer would have made a similar choice.'" *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (quoting *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995)) (emphasis added); *accord Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007). Thus, to be protected by qualified immunity

21

officers need not show, as the majority's erroneous (and demanding) articulation requires, that "no officer" could have thought the challenged conduct was unconstitutional. Rather, defendants need only show that at least one reasonable officer, taking the plaintiffs' allegations as true, could believe such conduct fell within constitutional constraints.[5]

This distinction matters. As we have said, "qualified immunity employs a deliberately 'forgiving' standard of review." *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013). It does so to ensure "that those who serve the government do so with the decisiveness and the judgment required by the public good." *Filarsky v. Delia*, 132 S. Ct. 1657, 1665 (2012) (internal quotation marks omitted). By failing to afford immunity when reasonable officers can disagree about the legality of an officer's action, the majority provides no breathing room for reasonable mistakes. But this flies in the face of the Supreme Court's admonition that qualified immunity is to provide "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341; *see also Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (noting that qualified immunity affords

---

[5] The majority's "no officer" reformulation of the qualified immunity test is contrary to this Circuit's precedent, *see, e.g., Provost*, 262 F.3d at 160; *Walczyk*, 496 F.3d at 163; *see also id.* at 169-70 (Sotomayor, J., concurring) (recognizing that this Circuit applies the "reasonable officers could disagree" standard), and also separates this Court from the six other circuits that have held that qualified immunity is appropriate when officers of reasonable competence could disagree on the constitutionality of the challenged conduct. *Hoffman v. Reali*, 973 F.2d 980, 986 (1st Cir. 1992); *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994); *Armstrong v. City of Melvindale*, 432 F.3d 695, 700-01 (6th Cir. 2006); *Wollin v. Gondert*, 192 F.3d 616, 625 (7th Cir. 1999); *Brittain v. Hansen*, 451 F.3d 982, 988 (9th Cir. 2006); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003).

officials "breathing room to make reasonable but mistaken judgments" without dread of potentially disabling liability (internal quotation marks omitted)).

The majority's novel rule is directly contrary, moreover, to extensive precedent discussing qualified immunity in the particular context of a police officer's assessment of probable cause to arrest. The legal standard for probable cause is clear – and notably, does not demand that an officer's assessment that a person is committing an offense be "correct or more likely true than false," *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion), but only that a "fair probability" of criminality exist, based on all the circumstances, *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As the Supreme Court has said, however, there are "limitless factual circumstances" that officers must confront when applying the probable cause standard. *Saucier*, 533 U.S. at 205. Accordingly, even when probable cause is lacking, as judged by a reviewing court, an officer is still entitled to qualified immunity where there is arguable probable cause – where "it was objectively reasonable for the officer to believe that probable cause existed, or . . . officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted); *accord Walczyk*, 496 F.3d at 163. Thus, so long as an officer chooses among the "range of responses . . . that competent officers [could] reasonably think are lawful," then the "officer enjoys qualified immunity for 'reasonable mistakes.'" *Walczyk*, 496 F.3d at 154 n.16 (emphases omitted) (quoting *Saucier*, 533 U.S. at 205).

It is difficult to see how this standard could possibly by deemed unsatisfied, given plaintiffs' allegations, as supplemented by the incorporated video material and photographic evidence. Each of the plaintiffs in this putative class action, as the

23

complaint alleges, was arrested on the roadway of the Brooklyn Bridge – a major route for New York City traffic, wholly obstructed by virtue of the demonstrators' unpermitted presence. The plaintiffs do not allege (and the video material does not show) that prior to reaching the Brooklyn Bridge, the plaintiffs were marching on roadways with the acquiescence of police. Rather, the plaintiffs were marching on sidewalks. Plaintiffs moved onto the Bridge roadway, *as they themselves allege*, following fellow demonstrators – demonstrators who, as the video footage shows, linked arms, loudly chanted "Whose streets? Our streets!" and "Take the Bridge!", and defied police instructions to remain on the sidewalk.

The plaintiffs contend that they did not hear the police instructions and that they believed officers were escorting them over the Bridge.[6] They allege, in sum, that they lacked intent. But as we have recognized before (although not today), "because the practical restraints on police in the field are greater with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue" as it relates to the arrestee's state of mind "*must be correspondingly great.*" *Zalaski*, 723 F.3d at 393 (omission in original) (quoting *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004)) (internal quotation marks omitted)(emphasis added); *see also Paff v. Kaltenbach*, 204 F.3d 425, 437 (3d Cir. 2000) (an officer's "judgment call" based on circumstantial evidence as to an offender's state of mind is entitled to qualified immunity where objectively reasonable, even when the issue is "close enough that

---

[6] As previously noted, however, none of the named plaintiffs allege observing any specific conduct by police at the Bridge that they understood to constitute an invitation to use the Bridge roadway.

24

there was the potential of a court subsequently determining that he made the wrong choice").

Thus, it does not matter whether an officer might reasonably have inferred as to any particular demonstrator that he or she might conceivably lack *mens rea* so long as the inference of a culpable intent was also reasonable. *See Conner v. Heiman*, 672 F.3d 1126, 1132 (9th Cir. 2012) (noting in the qualified immunity context that whether an inference of innocent intent "was also reasonable, or even more reasonable, does not matter so long as the [culpable intent] conclusion was itself reasonable"). Similarly, it does not matter whether a particular demonstrator *in fact* lacked *mens rea* (and so could not be convicted of disorderly conduct) so long as a reasonable officer could have believed to the contrary.

Here, plaintiffs have failed to allege facts plausibly suggesting that it was anything *but* reasonable for any officer – named or John Doe – to conclude that each of the plaintiffs on the roadway of the Bridge (among the thousands who did not take to the roadway and were not arrested) was obstructing traffic with "intent to cause public inconvenience" or "recklessly creating a risk thereof." N.Y. Penal Law § 240.20(5). The majority has no persuasive argument showing that as a matter of clearly established law *about which all reasonably competent officers would agree*, police officers should have realized they were acting unconstitutionally in making arrests. Stripping the complaint of rhetoric and conclusions unsupported by factual assertions, the named plaintiffs allege nothing more than that Captain Jaskaran's bullhorn was not loud enough to be heard by them and that police had earlier assisted demonstrators in crossing against the light. Simply put, these meager allegations are insufficient to draw into question the defendants' arguable probable

25

cause. Accordingly, the defendants are presently entitled to qualified immunity, and this complaint should be dismissed.

Finally, it is telling that the majority's response to my dissent turns its treatment of qualified immunity from bad to worse. Not only does the majority – contrary to Second Circuit precedent – assert that officers must be denied qualified immunity at the motion to dismiss stage even if, based on the plaintiffs' allegations, officers of reasonable competence could disagree about the constitutionality of an arrest, the majority now also resurrects a *subjective* intent element that officers must satisfy before they can be afforded immunity. The majority asserts that these defendants will be entitled to qualified immunity, if at all, only after they show "what reasoning process they followed[,] . . . why [they] chose to retreat onto the bridge, and what if anything they intended to convey." Maj. Op. 27. This is an attempt, *sub silentio*, to turn back the clock on qualified immunity law. Previously, courts applied a subjective component to the qualified immunity test, but in *Harlow*, the Supreme Court excised this subjective inquiry and defined "the limits of qualified immunity essentially in objective terms." *Harlow*, 457 U.S. at 819. The Court did so in order to ensure that qualified immunity could be decided *earlier* in the course of the litigation. *See id.* at 817-18. Following *Harlow*, the Supreme Court has held that "[e]vidence concerning the defendant's subjective intent is simply irrelevant to [the qualified immunity] defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998); *see also Anderson*, 483 U.S. at 641 (noting, in context of assessing whether officer was entitled to qualified immunity in connection with a search, that "subjective beliefs about the search are irrelevant."). The majority's decision also contravenes this long-settled Supreme Court precedent.

\* \* \*

The majority has failed to afford the NYPD officers policing the "Occupy Wall Street" march the basic protection that qualified immunity promises – namely, that police officers will not be called to endure the effort and expense of discovery, trial, and possible liability for making reasonable judgments in the exercise of their duties. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (reiterating the "importance of resolving immunity questions at the earliest possible stage in litigation"). The majority attempts to weave "Rashomon-like" complexity into the question whether police officers had probable cause to arrest unpermitted demonstrators who were wholly obstructing traffic on the Brooklyn Bridge. But this is, in fact, a simple case. The plaintiffs have alleged neither "violation of [any] clearly established . . . right," *Wood*, 134 S. Ct. at 2066, nor objectively unreasonable conduct by police. In such circumstances, this complaint should be dismissed.

I fear that, over time, the majority's "Rashomon-like" interpretation of *Cox* will prove a poor instrument, indeed, for micromanaging, through threat of class action liability, the sensitive function of policing large demonstrations. Indeed, by unwarrantedly exposing these officers to the costs of class action litigation for arresting unpermitted demonstrators who had blocked all traffic on the Brooklyn Bridge (and on the theory that police officers' earlier, successful efforts to shepherd thousands safely through New York's downtown imposed on police unanticipated constitutional constraints), the majority makes more difficult the judicious use of discretion in policing large crowds. This decision will thus frustrate, not further, the work of police attempting to facilitate peaceful demonstrations while ensuring both the safety of demonstrators and those among whom demonstrations are staged.

27

As the Supreme Court has said, qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. The plaintiffs have alleged no irresponsible conduct by these police officers and the majority has struck the balance badly, depriving these officers of qualified immunity absent any basis in clearly established law and in circumstances in which it is impossible to conclude that an officer could not reasonably believe that his conduct was lawful. For this reason, I respectfully dissent.